**CLARK HILL LLP**
Myriah Jaworski (SBN 336898)
mjaworski@clarkhill.com
Ali Bloom (SBN 347446)
abloom@clarkhill.com
One America Plaza
600 West Broadway, Suite 500
San Diego, CA 92101
Telephone: (619) 557-0404
Facsimile: (619) 557-0460

Chirag H. Patel (*pro hac vice*)
cpatel@clarkhill.com
130 E. Randolph
Suite 3900
Chicago, IL 60601
Telephone: (312) 985-5900
Facsimile: (312) 985-5999

*Attorneys for Defendant National Notary Association*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA TURNER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL NOTARY ASSOCIATION,<br><br>Defendant. | Case No. 2:25-CV-00334-FMO-PD<br><br>**DEFENDANT NATIONAL NOTARY ASSOCIATION'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>Date:      May 1, 2025<br>Time:      10:00AM<br>Ctrm:      6D<br>Judge:    Fernando M. Olguin |

//

//

//

//

//

//

# REPLY IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................. 1

II. ARGUMENT ..................................................................... 3

    A.  Plaintiff Lacks Standing and the Court Should Dismiss the Complaint Under Federal Rule 12(b)(1)................................. 3

        1.  Turner Has no Article III Injury-in-Fact. ................................. 3

        2.  NNA's Factual 12(b)(1) Challenge Shows No Harm Occurred. .................................................................. 5

            a.  There is No Question of Material Fact NNA Never Disclosed Turner's NNA Course Purchase to Meta. ......................................... 6

            b.  Turner Has No Privacy Interest in Her NSA Certification the from the NNA (or the Underlying Course). ................................... 7

            c.  Turner Cannot Demonstrate a VPPA Harm because the NNA Does Not Disclose the Titles of Purchased Courses to Meta......................... 9

    B.  The Plaintiff's Complaint Also Fails Under Rule 12(b)(6). .............. 11

        1.  The NNA is Not a Video Tape Service Provider. .................... 11

        2.  The Plaintiff Fails the NNA's "Disclosure" Requirement......................................................... 15

            a.  No disclosure of private information as a matter of fact occurred.......................................... 15

            b.  Turner does not allege facts showing that NNA "knowingly" disclosed information .............................. 15

            c.  Turner's Allegations are Not Sufficient to Demonstrate that Meta collected her FID. .................... 17

            d.  Cookie data Would not Allow an "Ordinary Person" to Identify Turner as Having Requested Private Video Information........................... 18

    C.  Turner's Intended Application of the VPPA is Unconstitutional ................................................... 19

i

1.    The VPPA is Unconstitutionally Vague under the
Fifth Amendment........................................................................ 19

2.    The VPPA as Applied Violates the First Amendment ............ 20

III.    CONCLUSION .......................................................................... 21

DEFENDANT NATIONAL NOTARY ASSOCIATIONS REPLY IN SUPPORT OF ITS MOTION TO
DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) ........................................................................ 6, 7

*Cantu v. Tapestry, Inc.*,
No. 22-CV-1974-BAS-DDL, 2023 WL 4440662 (S.D. Cal. July
10, 2023) .......................................................................................................... 12, 14

*Carpenter v. United States*,
585 U.S. 296 (2018) ............................................................................................. 21

*Carroll v. Gen. Mills, Inc.*,
No. CV 23-1746 DSF, 2023 WL 4361093 (C.D. Cal. June 26,
2023) ................................................................................................................. 12, 14

*Carter v. Scripps Network, LLC*,
2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ...................................................... 11

*Central Hudson Gas & Electric Corp. v. Public Service Commission*,
447 U.S. 557 (1980) ....................................................................................... 20, 21

*Cirulli v. Hyundai Motor Co.*,
No. SACV 08-0854 AG (MLGx), 2009 WL 5788762, at *3-*4
(C.D. Cal. June 12, 2009) ................................................................................... 16

*Cook v. GameStop, Inc.*,
689 F. Supp. 3d 58 (W.D. Pa. 2023) ...................................................................... 9

*Czarnionka v. Epoch Times Ass'n, Inc.*,
No. 22 CIV. 6348 (AKH), 2022 WL 17069810 (S.D.N.Y. Nov. 17,
2022) ................................................................................................................. 16, 17

*Edwards v. Learfield Commc'ns, LLC*,
697 F. Supp. 3d 1297 (N.D. Fl. 2023) ................................................................. 18

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979, 985 (9th Cir. 2017) .................................................................. 18, 19

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) ............................................................................ 18

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ................................................................. 17

*Fraley v. Facebook, Inc.*,
    830 F. Supp. 2d 785 (N.D. Cal. 2011) ............................................... 4, 5

*Frawley v. Nexstar Media Grp. Inc.*,
    No. 3:23-CV-2197-L, 2024 WL 3798073, at *3 (N.D. Tex. July
    22, 2024), *rep. and rec. adopted*, No. 3:23-CV-2197-L, 2024 WL
    3807700 (N.D. Tex. Aug. 13, 2024) ....................................................... 5

*Freedom to Travel Campaign v. Newcomb*,
    82 F.3d 1431 (9th Cir. 1996) ................................................................ 19

*Garza v. Alamo Intermediate II Holdings, LLC*,
    No. 23-CV-05849-VC, 2024 WL 1171737 (N.D. Cal. Mar. 19,
    2024) ........................................................................................................ 9

*Ghanaat v. Numerade Labs, Inc.*,
    689 F. Supp. 3d 714 (N.D. Cal. 2023) ................................................. 17

*Gonzalez v. Planned Parenthood of L.A.*,
    759 F.3d 1112, 1115 (9th Cir. 2014) ..................................................... 5

*Hawkins v. City & Cnty. of Denver*,
    170 F.3d 1281 (10th Cir. 1999) ........................................................... 20

*Heerde v. Learfield Commc'ns, LLC*,
    741 F. Supp. 3d 849 (C.D. Cal. 2024) (Aenlle-Rocha, J.) ................... 19

*Hoge v. VSS-S. Theaters LLC*,
    No. 1:23-CV-346, 2024 WL 4547208 (M.D.N.C. Sept. 10, 2024) ......... 8

*Hoge v. VSS-S. Theatres LLC*,
    No. 24-2009, 2024 WL 5509495 (4th Cir. Dec. 4, 2024) ...................... 9

*Italian Colors Rest. v. Becerra*,
    878 F.3d 1165 (9th Cir. 2018) ............................................................. 20

*Li v. Georges Media Grp. LLC*,
    No. CV 23-1117, 2023 WL 7280519 (E.D. La. Nov. 3, 2023) ............. 16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................... 6

iv

CASE NO.: 2:25-CV-00334-FMO-PD

*Markels v. AARP*,
    689 F. Supp. 3d 722 (N.D. Cal. 2023) ................................................ 3, 11, 12, 13

*Mata v. Zillow Grp., Inc.*,
    No. 24-CV-01095-DMS-VET, 2024 WL 5161955 (S.D. Cal. Dec.
    18, 2024) ......................................................................................... 3, 13, 14

*N.M. Youth Organized v. Herrera*,
    611 F.3d 669 (10th Cir. 2010) ...................................................................... 20

*In re Nickelodeon Consumer Privacy Litig.*,
    827 F.3d at 267 .............................................................................................. 18

*Osheske v. Silver Cinemas Acquisition Co.*,
    700 F. Supp. 3d 921 (C.D. Cal. 2023) ............................................................ 8

*Porter v. Gore*,
    517 F. Supp. 3d 1109 (S.D. Cal. 2021) ......................................................... 20

*Resnick v. Hyundai Motor Am., Inc.*,
    No. CV1600593BROPJWX, 2017 WL 1531192 (C.D. Cal. Apr.
    13, 2017) ....................................................................................................... 16

*Robinson v. Disney Online*,
    152 F. Supp. 3d 176 (S.D.N.Y. 2015) ........................................................... 15

*Rodriguez v. JP Boden Servs. Inc.*,
    No. 23-CV-00534-L-VET, 2024 WL 559228 (S.D. Cal. Feb. 12,
    2024) ....................................................................................................... 11, 14

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ......................................................................... 6

*Saunders v. Hearst Television, Inc.*,
    711 F. Supp. 3d 24 (D. Mass. 2024) .............................................................. 21

*Sellers v. Bleacher Rep., Inc.*,
    No. 23-CV-00368-SI, 2023 WL 4850180 (N.D. Cal. July 28, 2023) ............... 12

*Shapiro v. Peacock TV*,
    No. 23-CV-6345 (KMK), 2025 WL 968519 (S.D.N.Y. March 31,
    2025) ............................................................................................................... 5

CASE NO.: 2:25-CV-00334-FMO-
PD

DEFENDANT NATIONAL NOTARY ASSOCIATIONS REPLY IN SUPPORT OF ITS MOTION TO
DISMISS

*Smith v. Maryland*,
    442 U.S. 735 (1979) ........................................................................................ 21

*Stark v. Patreon, Inc.*,
    635 F.Supp.3d 841 (N.D. Cal. 2022).................................................3, 12, 13, 14

*Stark v. Patreon, Inc.*,
    656 F. Supp. 3d 1018 (N.D. Cal. 2023) ........................................................... 21

*In re Vizio, Inc., Consumer Priv. Litig.*,
    238 F. Supp. 3d 1204 (C.D. Cal. 2017)..............................................3, 11, 13, 14

**Statutes**

18 U.S.C.
    § 2710(b)(1)........................................................................................................ 15
    § 2710(b)(2)(B).................................................................................................... 9

California's Consumers Legal Remedies Act ....................................................... 16

**Rules**

Fed. R. Civ. P. 12(b)(1) ...............................................................................2, 5, 6, 7

Fed. R. Civ. P. 12(b)(6) .................................................................................... 11

Fed. R. Civ. P. 56.................................................................................................. 6

Rule 56's ............................................................................................................... 7

**Constitional Provisions**

U. S. Const. amend. I..................................................................................... 20, 21

U. S. Const. amend. IV......................................................................................... 21

**Other Authorities**

134 Cong. Rec. S5399 (May 10, 1988).................................................................. 8

https://www.nationalnotary.org/california/insurance (last accessed
    April 15, 2025) ............................................................................................... 13

https://www.nationalnotary.org/california/signing-agent/become-a-
    signing-agent ................................................................................................... 2

vi                                    CASE NO.: 2:25-CV-00334-FMO-
                                                                      PD

https://www.nationalnotary.org/california/supplies (last accessed
    April 15, 2025) ................................................................................. 13

https://www.nationalnotary.org/california/training (last accessed April
    15, 2025) ....................................................................................... 14

https://www.nationalnotary.org/knowledge-center (last accessed April
    15, 2025) ....................................................................................... 14

https://www.nationalnotary.org/resources-for/government (last
    accessed April 15, 2025) ................................................................ 13

*Markels* (AARP) ................................................................................... 14

Meta for Developers. Available at:
    https://developers.facebook.com/docs/meta-pixel/reference (last
    accessed April 16, 2025) ................................................................ 16

National Notary Association, available at:
    https://www.nationalnotary.org/notary-signing-agent-training (last
    accessed April 17, 2025) .................................................................. 1

URL (https://www.nationalnotary.org/notary-signing-agent-training) ................... 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CASE NO.: 2:25-CV-00334-FMO-
PD

DEFENDANT NATIONAL NOTARY ASSOCIATIONS REPLY IN SUPPORT OF ITS MOTION TO
DISMISS

## I.    INTRODUCTION[1]

Nothing is private about the fact that Plaintiff Teresa Turner ("Turner" or "Plaintiff") obtained a loan signing agent certification ("NSA certification") from Defendant National Notary Association ("NNA"). She promotes it on her business website. She promotes on Facebook. She promotes it on LinkedIn, where she expressly states that she obtained the certification from the NNA:



Decl.¶¶ 34-40. There is nothing wrong with Turner publicizing her qualifications. But her attempt to manufacture a VPPA claim against NNA based on a ubiquitous online pixel and an alleged disclosure of her NNA course title and URL (which itself did not occur) demonstrates exactly why the VPPA was not intended to apply to public professional information.

Turner's Opposition attempts to draw an imaginary line between her NNA-earned NSA certification and the title of the NNA course through which she earned that certification (which is simply "NSA Certification Training and Exam"[2]). But

---

[1] The NNA's Motion to Dismiss [ECF No. 14] is cited as "Motion" or "Mot." and the supporting Robert Clarke declaration [ECF No. 14-1] is cited as "Declaration" or "Decl." Turner's Opposition [ECF No. 27] is cited as "Opposition" or "Opp.," and Plaintiff's attorney declaration [ECF No. 27-1] is cited as "Plaintiff's Declaration" or "Pl.'s Decl.").

[2] "NSA Certification and Training and Exam." National Notary Association, available at: https://www.nationalnotary.org/notary-signing-agent-training (last accessed April 17, 2025).

the obvious and only inference from Turner's self-identification as having obtained a NSA certification from the NNA is that she completed the NNA's underlying course to obtain that certification. The NSA's coursework is publicly posted on the NNA's website.[3] Thus, the NSA certification course title and corresponding URL reveal nothing that she has not already revealed and promoted all over the internet. Decl. ¶¶ 33-37 and Ex. 1-2. Turner never explains why this semantic distinction makes any difference under the VPPA. *See* Opp. at 9. She cannot, and instead attempts to elevate a technical VPPA violation (which never actually occurred), over the narrow, context-specific privacy interests the VPPA was designed to protect.

Not only is the fact that Turner obtained her NSA certification from a NNA course entirely public, but the alleged disclosure to Meta also never occurred. Turner's Opposition injects new facts relating to a website visitor simply adding a course to their shopping cart. Opp. at 16; Jackson Decl. ¶ 5. But Turner does not controvert the NNA's declaration that Meta is never informed of whether the user completes the purchase or views video content contained within the purchased materials. Thus, as a matter of fact, there is no disclosure of the "titles and subject matter of the videos . . . *purchased*" Compl. ¶1 (emphasis added), by Turner or anyone else.

Turner's internet publications and the NNA's Declaration are properly before this Court on the NNA's Rule 12(b)(1) factual challenge. Turner neither controverts these facts nor points to any discovery that could change these conclusions (and none exist). This Court should find that Turner has no Article III injury-in-fact. *See* § II(A), *infra*.

The NNA also is not a video tape service provider ("VTSP"). The Opposition focuses on cases where defendant's core product or services focused on delivery of

---

[3] *See* https://www.nationalnotary.org/california/signing-agent/become-a-signing-agent (listing steps to become a loan signing agent) (last accessed April 16, 2025).

video content – smart TVs that promoted streaming video delivery (*In re Vizio*), a YouTube-like streaming platform (*Stark v. Patreon*), and a platform offering virtual video tours of real estate (*Mata v. Zillow*). But Turner ignores *Markels v. AARP*, 689 F. Supp. 3d 722, 728 (N.D. Cal. 2023), which is directly on point. Like the AARP, the NNA offers a diverse set of products, services, and advocacy for its constituents. The provision of *some* of its educational content through video does not transform it into a VTSP. *See* § II(B), *infra*.

Turner's application of the VPPA is also unconstitutional because it seeks to punish the NNA for allegedly communicating true and public facts. *See* § II(C), *infra*.

Together, these facts underscore the VPPA's inapplicability to this case. The Court should grant the NNA's Motion and dismiss this case with prejudice.

## II.    ARGUMENT

### A.    Plaintiff Lacks Standing and the Court Should Dismiss the Complaint Under Federal Rule 12(b)(1).

Turner makes no attempt to assert an actual injury that she suffered from the NNA's supposed disclosure. *See* § II(A)(1), *infra*. Nor can she, because she neither holds nor ever held any privacy interest in the fact that she obtained her NSA certification following completion of an NNA course. She publicizes this information herself. *See* § II(A)(2), *infra*. In any event, the disclosure that she relies upon never occurred. Turner's Opposition points only to a non-representative exemplar action of an individual merely adding a course to their shopping cart (which would not inform Meta whether a user purchased that course). *See* § II(A)(3), *infra*.

#### 1.    Turner Has no Article III Injury-in-Fact.

Turner never argues that she suffered any distinct harm – monetary, physical, emotional, or otherwise – from the NNA allegedly sharing with Meta that she

obtained her NSA certification from an NNA course. Opp. at 5-6. And no such harm exists as Turner does not have a protectable privacy interest in the NNA course.

Turner herself told Meta and the rest of the world that she obtained her NSA certification from the NNA. That necessarily means she took the underlying NNA course. Sharing the title of an NNA course (*e.g.*, "NNA Certification Training and Exam")[4] does not instantly constitute some "highly offensive" violation of a privacy interest just because the coursework contained some video content. *See contra* Opp. at 7. And Turner does not explain why sharing the course title would trigger VPPA liability or further VPPA's underlying privacy goals. She cannot. Everything about Turner's NSA certification and NNA's related coursework is public. Her theory is based on a purely procedural, supposed VPPA violation, divorced entirely from the statute's underlying language and privacy goals.

Moreover, Plaintiff's allegations regarding the NNA's website and related courses are far from well pled. They are conclusory and closely mirror those in other VPPA cases Plaintiff's counsel has filed. *See* Opp. at 5-6 (citing Compl. ¶¶ 1-3, 9, 41, 63, 71); Mot. 3 n.3 (index of substantially similar cases), 8.

Most importantly, Turner cannot through conclusory allegations turn the NNA and its website into something it is not. Turner does not dispute that when standing is factually attacked, this Court may consider extrinsic evidence, and her allegations are not entitled to a presumption of truth. *See Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 793-94 (N.D. Cal. 2011). Also, facts ascertained from the NNA's public website, Turner's business website, and Turner's social media profiles are all proper subjects of judicial notice and supersede her conclusory allegations. *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) ("Although we normally treat all of plaintiff's factual allegations in a complaint as true, we need not... accept as true allegations that contradict matters properly subject

---

[4] *See* n. 2., *supra*.

DEFENDANT NATIONAL NOTARY ASSOCIATIONS REPLY IN SUPPORT OF ITS MOTION TO DISMISS

to judicial notice or by exhibit." (internal quotation omitted)). And there is no doubt that these websites are proper subjects of judicial notice. Mot. at 14-15 (collecting cases); *see also Frawley v. Nexstar Media Grp. Inc.*, No. 3:23-CV-2197-L, 2024 WL 3798073, at \*3 (N.D. Tex. July 22, 2024), *rep. and rec. adopted*, No. 3:23-CV-2197-L, 2024 WL 3807700 (N.D. Tex. Aug. 13, 2024) (taking judicial notice of website in VPPA motion to dismiss); *Shapiro v. Peacock TV*, No. 23-CV-6345 (KMK), 2025 WL 968519, at \*7, n. 4 (S.D.N.Y. March 31, 2025) ("A court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." (internal citation omitted)). Tellingly, Turner's Opposition does not challenge the accuracy of the NNA's Declaration or the authenticity of the matters for which the NNA requests the Court to take judicial notice. The Opposition reduces the discussion of judicial notice to a mere footnote, and incorrectly states that the NNA only seeks judicial notice of ["P]laintiff's job title." *Id.*

Turner's publications and the NNA's website establish that: (a) Turner published that she obtained her NSA certification from the NNA, (b) the NSA course title and URL do not reveal any additional information, and (c) the NNA does not primarily sell video content. Thus, Turner has failed to demonstrate any Article III injury.

### 2. NNA's Factual 12(b)(1) Challenge Shows No Harm Occurred.

On NNA's Rule 12(b)(1) factual challenge, Turner bears the burden of proving an injury exists. *Fraley*, 830 F. Supp. 2d at 793-94. The Court may consider extrinsic evidence and her allegations are not entitled to a presumption of truth. *Id.*; *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). As explained in the NNA's Motion, Turner lacks Article III standing because (1) her NSA certification from the NNA is public, and (2) the alleged disclosure never occurred.

Mot. at 9-13.

**a.    There is No Question of Material Fact NNA Never Disclosed Turner's NNA Course Purchase to Meta.**

Turner's Opposition suggests that the Court may not consider the NNA's 12(b)(1) challenge "at this stage of the litigation." Opp. at 8. Turner is apparently arguing that the Court must accept as true, at all times, all allegations in the complaint. Turner's own authorities demonstrate that this is incorrect.

The Opposition misreads and misapplies the Ninth Circuit's decision in *Bowen v. Energizer Holdings, Inc.,* 118 F.4th 1134 (9th Cir. 2024). *Bowen* supports granting the NNA's Rule 12(b)(1) factual challenge because there is not a question of fact that Turner's information is public and the alleged disclosure did not occur. In a 12(b)(1) factual challenge, Article III standing is:

> "not [a] mere pleading requirement[ ] but rather an indispensable part of the plaintiff's case, [it] must be supported in the **same way as any other matter on which the plaintiff bears the burden of proof,** *i.e.***, with the manner and degree of evidence required at the successive stages of the litigation.**"

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis added). *Bowen* merely follows *Lujan*'s direction to district courts to apply Rule 56's summary judgment standard to a 12(b)(1) factual challenge. It does not state that applying that standard precludes courts from ruling on a Rule 12(b)(1) factual challenge when presented with evidence showing the absence of any material factual dispute.

In *Bowen*, a consumer alleged that a manufacturer's claim that its sunscreen was "safe" was misleading because the product contained benzene which she alleged was a carcinogen. *Id.* at 1140. The manufacturer filed a Rule 12(b)(1) factual challenge relying on FDA guidance that small amounts of benzene are allowable when a manufacturer has no alternative, and the consumer plaintiff responded with counterevidence that benzene at any level was unsafe. *Id.* at 1139. The Ninth Circuit held that because the manufacturer's factual challenge involved intertwined merits

and standing issues, it would apply Rule 56's summary judgment standard. Applying that standard, the Ninth Circuit held there was a material issue of fact as to whether benzene was safe because (a) the FDA guidelines did not establish benzene's safety at any level "as a matter of law" and (b) the consumer submitted counter-evidence *and pointed to specific evidence that might be adduced in discovery* that would further support her claim. *Id*. at 1147-48.

Unlike the plaintiff in *Bowen*, Turner neither adduces counterevidence to meet her burden of establishing subject matter jurisdiction nor points to any discovery that would counter the facts that are properly before this Court. And no such facts exist:

- Turner's public disclosure of her NSA Certification is based on publicly available facts. No information exists that could show that this information is private (and Turner does not argue any exists).

- Turner does not dispute that the NNA's website does not transmit the titles and URLS of *purchased* NNA courses to Meta, as attested to in the NNA Declaration; and she also not does not argue that any other discovery is necessary. *See* Opp at 7-8.

Because no material question of fact exists on these issues, the Ninth Circuit's decision in *Bowen* supports granting the NNA's Rule 12(b)(1) challenge.

### b.  Turner Has No Privacy Interest in Her NSA Certification the from the NNA (or the Underlying Course).

Turner does not dispute the authenticity of the screenshots of her LinkedIn profile, Facebook profile, and business website in the NNA's supporting Declaration. Opp. at 9-11. These public webpages on their face show that Turner actively promotes that she is a loan signing agent and that she obtained her NSA certification from the NNA. Mot. at 9-11; Decl. Exs. 1-4. A description of NNA's NSA certification course (and its underlying coursework) is also publicly displayed

CASE NO.: 2:25-CV-00334-FMO-PD

on the NNA's website. *See* n. 2, 3, *supra*. (NSA training courses and steps to become an NSA), *supra*.

Turner's sole argument is that, despite disclosing that she had obtained her NSA certification from the NNA, she did not disclose the title and corresponding URL of the NNA course through which she obtained that exact certification (which allegedly contained video content) Opp. at 3; 9-10.

This is a distinction without a difference. By revealing that she obtained her NSA certification from the NNA, Turner *necessarily* also revealed that she obtained that certification through an NNA course. The title the course ("Notary Signing Agent Training & Exam") and course description URL (https://www.nationalnotary.org/notary-signing-agent-training) do not reveal anything about Turner's "likes and dislikes" or her "interests and [] whims." Compl. ¶ 20 (citing 134 Cong. Rec. S5399 (May 10, 1988) (VPPA legislative record)). Rather, this conveys the exact same information as her stating has an NSA certification from NNA: that she took the necessary course from the NNA to become a loan signing agent.

The fact that Turner could have elected to complete an in-person NSA certification (disclosure of which would not be privacy violation under Turner's theory), only demonstrates that Turner's VPPA's theory is arbitrary and divorced from its underlying purpose. The VPPA is not concerned with disclosure of video information alone - rather the VPPA is concerned with a disclosure of video information that could *reveal private information* about the viewer. That is exactly why a movie theater's disclosure to Meta of the film titles a person watched in a public theater does not violate the VPPA. *See Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921, 926-27 n.4 (C.D. Cal. 2023); *Hoge v. VSS-S. Theaters LLC*, No. 1:23-CV-346, 2024 WL 4547208 (M.D.N.C. Sept. 10, 2024), appeal dismissed sub nom; *Hoge v. VSS-S. Theatres LLC*, No. 24-2009, 2024 WL 5509495

(4th Cir. Dec. 4, 2024) (same); *Garza v. Alamo Intermediate II Holdings, LLC*, No. 23-CV-05849-VC, 2024 WL 1171737 (N.D. Cal. Mar. 19, 2024) (same).

Turner makes no attempt to explain how the alleged disclosure that she obtained her NSA certification course online (as opposed to in-person) offends any privacy interest. Opp. at 9-11.

Last, Turner makes a passing argument that consent is an affirmative defense in her opposition to the NNA's 12(b)(6) arguments. Opp at 12 n. 3. But consent focuses on whether Turner consented to the NNA alleged disclosing her information. *See* 18 U.S.C. § 2710(b)(2)(B). The NNA's argument is that the information she claims was disclosed was not private in the first place because of her widespread publication and the professional nature of that information. Mot. at 9-12. *See e.g., Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58, 63 (W.D. Pa. 2023) ("public disclosure of private information requires, obviously 'private facts'").

Turner lacks Article III standing because she cannot demonstrate any privacy injury that the VPPA is intended to protect.

**c.    Turner Cannot Demonstrate a VPPA Harm because the NNA Does Not Disclose the Titles of Purchased Courses to Meta.**

Alternatively, even if her NSA certification course Turner obtained from the NNA was private video information, the NNA never disclosed her purchase of that course to Meta. As Turner explains, her VPPA claim is premised on the NNA allegedly sharing "*purchases* [she] made on the [NNA's website] to Meta." Opp. at 1 (emphasis added); *see also* Opp. at 5 ("prerecorded videos requested or obtained by each of its *purchasers*") (emphasis added); 9 ("*purchased* particular prerecorded video materials") (emphasis added). However, the NNA's supporting declaration demonstrates that it does not share purchase information with Meta (or any information regarding the user's interactions with courses following that purchase). Mot. at 12-13; Decl. ¶¶ 18-20. Specifically:

- To purchase course, a user adds the course to their "shopping cart" and then proceeds through a check-out page, Decl. ¶ 18;

- The shopping cart (nationalnotary.org/shoppingcart) and checkout (nationalnotary.org/checkout) pages have generic URLs, Decl. ¶ 20;

- The NNA does not transmit any information to Meta that would inform it that a user made a purchase of a course in the shopping cart, Decl. ¶¶ 21-23; and

- After purchase, the NNA does not transmit any information to Meta about the user's interactions with that course, Decl. ¶¶ 24-31.

Turner does not dispute the facts in the NNA's declaration. Opp. at 8. Rather, the Opposition focuses on an entirely different interaction: a website visitor placing a course into their shopping cart. *Id.*; Pl.'s Decl. ¶¶ 2-5.

But even if Turner's allegations regarding the shopping cart are true, the result is the same. At most, Meta was informed that an NNA visitor had considered a course. Meta was never informed whether a visitor actually "*purchased* [those] particular prerecorded video materials." Opp. at 9. Turner does not contest the fact that the NNA never shared information with Meta regarding "prerecorded videos requested or obtained by [NNA's] ***purchasers***" Opp. at 5 (emphasis added).

To be sure, Turner does not allege or argue that disclosing the title of a course placed in a user's cart is itself a violation of the VPPA. *See* Opp. at 8. Rather, she misleadingly argues that adding a product to a cart is synonymous with sharing information regarding "videos requested or obtained by *each of its purchasers*." Opp. at 16 (emphasis added). Turner's conclusion is not supported by her attorneys' own declaration and is disproved by NNA's Declaration. Accordingly, the NNA never disclosed to Meta that Turner purchased the NNA's NSA certification course, and Turner thus lacks Article III standing.

**B.     The Plaintiff's Complaint Also Fails Under Rule 12(b)(6).**

If Turner's complete lack of standing were not enough, her Complaint also fails to state the vital elements of a VPPA claim. First, the NNA is not a "video tape service provider" because delivering video content is not the "focus" or "defining feature" of its business. *See* § II(B)(1), *infra*. Second, Turner cannot demonstrate that the NNA knowingly disclosed her personal video viewing information ("PII"). *See* § II(B)(2), *infra*.

**1.     The NNA is Not a Video Tape Service Provider.**

Turner's Opposition does not point to any facts sufficient to demonstrate that delivering covered video content is the NNA's "defining feature" and "focus" of its business. *Rodriguez v. JP Boden Servs. Inc.*, No. 23-CV-00534-L-VET, 2024 WL 559228, at *4 (S.D. Cal. Feb. 12, 2024). Rather, Turner's Complaint alleges that training courses containing videos is one the products offered by "the largest and oldest organization in the United States serving notaries." Compl. ¶14. By Turner's own admission the NNA also offers "certifications, training, seminars, conferences, and printed and online educational materials." Compl. ¶14. A brusque review of the NNA's website confirms that courses containing video are a *de minimus* feature of the NNA's overall business.

Courts have consistently found "engaged in the business" means that the "rental, sale or delivery of audio visual materials" must be a "defining feature" or "focus" of defendant's business. *Rodriguez*, 2024 WL 559228, at *4 (S.D. Cal. Feb. 12, 2024) ("defining feature"); *Carter v. Scripps Network, LLC*, 2023 WL 3061858, *5 (S.D.N.Y. Apr. 24, 2023) (must be the "focus" of the business); *Markels*, 689 F. Supp. 3d at 728 (defendant must be "substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose" (emphasis added)); *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221-22 (C.D. Cal. 2017) ("engaged in the business" "connotes a particular field of

endeavor, *i.e.* a focus of the defendant's work" (internal quotations and citations omitted)).

The organization at issue in *Markels*, 689 F. Supp. 3d at 728, is the most analogous to the NNA. In *Markels*, a plaintiff asserted a VPPA claim against the well-known AARP (a "nonprofit organization that helps people navigate ageless realities") based on its alleged deployment of the Meta Pixel on its website. *Id*. at 726-27. The plaintiff alleged that as part of the AARP's mission, its websites "offers content such as videos, podcasts, and games." *Id*. at 727. The plaintiff argued that AARP was "substantially involved in the conveyance of its video content (*i.e.* that it creates and maintains the content rather than relying on a third-party to do so)." *Id*. The district court held that these allegations were insufficient to demonstrate that "providing video content is a substantial or significant purpose of AARP." *Id*. The district court noted that a company's creation of its own video content alone is insufficient to demonstrate a company is VTSP, particularly when it is ancillary to the company's purpose. *Id*.

Other courts are in accord with this framework. *Carroll v. Gen. Mills, Inc*., No. CV 23-1746 DSF (MRWX), 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023) ("Plaintiffs do not allege any facts suggesting that the delivery of audiovisual material is [a food company's] particular field of endeavor or that [a food company's] products are specifically tailored to serve audiovisual material"); *Cantu v. Tapestry, Inc*., No. 22-CV-1974-BAS-DDL, 2023 WL 4440662, at *8 (S.D. Cal. July 10, 2023) (apparel company is not a VTSP); *Sellers v. Bleacher Rep., Inc*., No. 23-CV-00368-SI, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023)(company is not a VTSP when "provid[ing] audio visual media that is incidental to [the defendant's] primary business").

The three cases relied upon by Turner are inapposite because they all involve products where video delivery was core feature of the disputed product. In *Stark v.*

DEFENDANT NATIONAL NOTARY ASSOCIATIONS REPLY IN SUPPORT OF ITS MOTION TO DISMISS

*Patreon, Inc.,* 635 F.Supp.3d 841, 852 (N.D. Cal. 2022), the defendant company (Patreon) hosted a video-streaming platform that allowed individual creators to upload their own videos, much like YouTube. In *Mata v. Zillow Grp., Inc*., No. 24-CV-01095-DMS-VET, 2024 WL 5161955, at *2 (S.D. Cal. Dec. 18, 2024), a real estate sales website had video walkthrough tours in its online sales listings. And in *In re Vizio,* 238 F. Supp. 3d at 1221–22, a TV manufacturer installed apps on their TVs that would "allow consumers to seamlessly access Netflix, Hulu, YouTube, and Amazon Instant Video content in their homes." The TV manufacturer was alleged to advertise its TVs as a "passport to a world of entertainment, movies, TV shows and more" and "charge[d] consumers a premium for its Vizio Smart TVs specifically because these Smart TVs are designed to stream video content." *Id*. at 1222.

Thus, in *Stark*, *Mata*, and *In re Vizio*, each plaintiff made factual non-conclusory allegations clearly establishing that the delivery of video content was a "substantial or significant purpose" of the defendant company's key product or services. *See Markels*, 689 F. Supp. 3d at 728.

Turner's Complaint is devoid of any such facts. To the contrary, and like the defendant in *Markels*, Turner alleges that the NNA is a "not-for-profit corporation," that is the "largest and oldest organization under the United States serving notaries," and offers wide range of services and products to the notary community, including "certifications, training, seminars, conferences, and printed and online educational materials." Compl. ¶14. The NNA's website further highlights the wide gamut of the NNA's activities and services, including: legislative advocacy for the notary community[5], books and supplies[6], insurance and bond products[7], a knowledge center

---

[5] https://www.nationalnotary.org/resources-for-government (last accessed April 15, 2025).

[6] https://www.nationalnotary.org/california/supplies (last accessed April 15, 2025).

[7] https://www.nationalnotary.org/california/insurance (last accessed April 15, 2025).

with free written articles covering "everything you need to know from becoming a Notary and performing notarizations, [and] Notary laws,"[8] and education, a part of which is in person and online training courses.[9]

Neither the pleadings nor the NNA's website suggests that the delivery of video is NNA's "substantial or significant" purpose.

Finally, Turner suggests that the NNA allegedly earning $3M[10] of its revenue from video-based content is sufficient to show that the NNA it a VTSP. Opp. at 14-15. But whether the NNA earns some revenue from selling prerecorded videos is not the applicable test – again, the Court's inquiry is focused on whether the defining feature and "focus" the NNA's business is the "rental, sale or delivery of audio visual materials." *Rodriguez*, 2024 WL 559228, at *4. Turner does not cite a single case that focuses on the revenue a defendant derives from video content, let alone one that holds that earning 10% of total revenue would make delivery of video materials the NNA's "substantial or significant purpose."

The NNA lacks any resemblance to the businesses in *Stark* (Patreon video streaming), *Mata* (Zillow virtual tours), and *In re Vizio* (Vizio smart TV apps), each of which had a primary product that focused on delivering a form of video content. This Court should follow *Markels* (AARP), *Carroll* (food company), and *Cantu* (apparel company), and should find that the NNA is not a VTSP because Turner alleges no facts demonstrating that video delivery is the defining feature and focus of the NNA's business. Nor should she, as the NNA's website shows education content containing video content is ancillary aspect of its overall business. *See* n. 5-9, *supra*.

---

[8] https://www.nationalnotary.org/knowledge-center (last accessed April 15, 2025).

[9] https://www.nationalnotary.org/california/training (last accessed April 15, 2025).

[10] This figure is Turner's attempt to extrapolate total revenue derived from content containing video from a 2008 court filing. Opp. at 14. This is not an accurate method to estimate 2024 revenue.

### 2. The Plaintiff Fails the NNA's "Disclosure" Requirement.

The VPPA requires Turner to allege that the NNA: (a) knowingly, (b) disclosed, (c) "information [that] identifies [Turner] as having requested or obtained specific video materials or services" from the NNA (*i.e.*, PII). 18 U.S.C. § 2710(b)(1); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015). She fails these requirements for several reasons:

#### a. No disclosure of private information as a matter of fact occurred

As set forth above in § II(A)(2)-(3), public facts demonstrate that the NNA does not disclose the titles of courses actually purchased on its Website. Additionally, public facts demonstrate that Turner has no privacy interest in the title and URL of her NSA certification course because she publicly discloses and promotes the exact certification she earned from that course. *See also* Mot. at 18.

#### b. Turner does not allege facts showing that NNA "knowingly" disclosed information

Turner's opposition does not point to any factual allegation sufficient to demonstrate that NNA knew that the Meta Pixel was allegedly transmitting the name of course titles and URLs to Meta. Opp. at 15-16. Rather, Turner makes three conclusory allegations that the NNA intentionally installed the Meta Pixel and configured it to disclose "Private Video Information to Meta." *Id.* (citing Compl. ¶¶ 41, 52, 61, 65). However, Turner does not articulate the specific changes that the NNA allegedly made to the Meta Pixel with the specific intention of causing it to transmit "Private Video Information to Meta." Compl. ¶ 65.

Again, Turner's entire theory is based on the transmission of three specific data elements that violate the VPPA - an FID, a course title, and a course URL. Opp. at 5 (citing Compl. ¶¶ 1-3, 41). However, Turner concedes two of these data elements are transmitted by default. Compl. ¶ 51. The sole allegation Turner makes as to the

NNA's customization of the Meta Pixel is that the NNA "configured the Meta Pixel on its Website to send Event Data to Meta." Compl. ¶ 52. But "events" are just "actions people take on [a] website," and [s]tandard events are predefined by Meta."[11] And the Meta Pixel can track a wide array of "events," including submitting a contact form, registering for the website, or customizing a product.[12]

Turner does not describe *what* event the NNA configured and how the NNA allegedly knew that configuration would cause its website to transmit "Private Video Information" to Meta. Compl. ¶ 65. *See Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022) (equating the VPPA's knowledge element to scienter). In cases where "knowledge" (i.e. scienter) is an element of the cause of action, courts require plaintiffs to make factual allegation sufficient to directly or circumstantially prove the defendant's actual knowledge. *See Resnick v. Hyundai Motor Am., Inc.*, No. CV1600593BROPJWX, 2017 WL 1531192, at *14 (C.D. Cal. Apr. 13, 2017)(allegations that defendant had "knowledge" of a defect in California's Consumers Legal Remedies Act (CLRA) claim); *Cirulli v. Hyundai Motor Co.*, No. SACV 08–0854 AG (MLGx), 2009 WL 5788762, at *3–*4 (C.D. Cal. June 12, 2009) (plaintiff had pleaded sufficient facts indicating "knowledge" of a defect where he alleged that defendant had reviewed reports of defective products).

Finally, Turner cites a series of cases where courts held that a plaintiff sufficiently pled the "knowing" element. However, those cases do not support Turner because they involved different allegations and a different argument by the defendant. *See e.g.*, *Li v. Georges Media Grp. LLC*, No. CV 23-1117, 2023 WL

---

[11] See "Specifications for Meta Pixel standard events." Meta Business Help Center, Available at:https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed April 16, 2025).

[12] See "Reference" Meta for Developers. Available at: https://developers.facebook.com/docs/meta-pixel/reference (last accessed April 16, 2025).

7280519, at *4 (E.D. La. Nov. 3, 2023)(complaint alleged that defendant knew that "URLs, video/names/descriptions, and FIDs are simultaneously disclosed" and "such combined data identifies Website users and the videos they watched"); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 721 (N.D. Cal. 2023)(defendant arguing that plaintiff must allege the recipient of the disclosure); *Czarnionka*, 2022 WL 17069810, at *4 (alleged that defendant installed Meta Pixel "knowing that Facebook would receive video titles and the subscriber's FID when a subscriber watched a video."

Turner's sole allegation that the NNA configured unspecific events is too vague to establish that the NNA intentionally configured the Meta Pixel to disclose private video information to the Meta. Turner fails to plead a "knowing" disclosure.

### c.    Turner's Allegations are Not Sufficient to Demonstrate that Meta collected her FID.

Under Turner's VPPA theory, Meta used an FID to associate her with a specific Facebook account, and then identified her as the person purchasing video content from the NNA. Compl. ¶¶ 3, 10. However, the Meta Pixel is only able to transmit an FID to Meta if that information was stored in a cookie on Turner's device at the time she accessed the NNA's website. Mot. at 19-20 (citing *In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 596 (9th Cir. 2020)). Thus, the Meta Pixel could transmit an FID only if Turner, at time she placed the NNA's NSA course in her shopping cart (again, the purchase itself is never transmitted to Meta), was either (i) logged into her Facebook account, or (ii) using a personal device that had previously stored the Facebook cookie containing her FID. *See* id. Turner alleges neither. *Id.*

Turner ignores this argument entirely. *See* Opp. at 11-17. Turner fails to allege sufficient facts to demonstrate the disclosure of her FID.

**d.**    **Cookie data Would not Allow an "Ordinary Person" to Identify Turner as Having Requested Private Video Information**

Finally, Turner's motion explains that the VPPA requires Turner to allege facts sufficient to demonstrate that NNA disclosed "information that would readily permit an ***ordinary person*** to identify" that Turner requested the covered video material from the NNA. Mot. at 19 (citing *In re Nickelodeon Consumer Privacy Litig.,* 827 F.3d at 267; Eichenberger v. ESPN, Inc., 876 F.3d 979, 985 (9th Cir. 2017) (adopting the Third Circuit's "ordinary person" standard)). Turner fails this requirement because: an "ordinary person" cannot decipher an FID transmitted as a "random strings of numbers," to ascertain Turner as the individual who placed the NSA Certification course in her shopping cart. Mot. at 20-21 (citing *Nickelodeon,* 827 F.3d at 282, n.124 (citing *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1254 (11th Cir. 2015)).

Turner makes no attempt to respond to this specific argument. Opp. at 17-18. Rather, Turner references back to her allegation that a "person can use an FID to identify a person 'by accessing the URL www.facebook.com/ and inserting the person's FID.'" Opp. at 17 (quoting Compl. ¶¶ 3, 62). Turner misses the point – to capture this FID, an individual would need to be capable of: (a) accessing the website's source code, (b) viewing the transmission of data in the case, and (c) having the ability to parse through the code and locate the FID. *See e.g.,* Pl.'s Delc. (showing "random strings of numbers").

That is not within the capabilities of an ordinary person. That was the point of *Nickelodeon,* 827 F.3d at 282. And *Edwards v. Learfield Commc'ns, LLC,* 697 F. Supp. 3d 1297, 1308 (N.D. Fl. 2023), applied *Nickelodeon* to FIDs in a VPPA claim and held that an FID does not meet the "ordinary person" test because it would require "unforeseeable detective work" to identify the owner of FID.

Turner's primary case, *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849 (C.D. Cal. 2024) (Aenlle-Rocha, J.), held that a "person's FID can be used to identify that person *if* [a] the person's Facebook profile is publicly accessible and [b] includes sufficient identifying information." (emphasis added). Nonetheless, the NNA submits that *Heerde* and others finding that an FID meets the "ordinary person" is not in accord with Ninth Circuit's decision in *Eichenberger*, 876 F.3d at 985-86. *Eichenberger*, 876 F.3d at 985-86, held that "[o]nly a more sophisticated person could parse the code at issue in that case, but stated in dicta that a "Facebook link or an email address" could be used by an "'ordinary person' to identify an individual." An FID is not a commonly used link or email address – it is a status identifier that is buried is a website's code. This Could should find that the FID is not "information that would readily permit an ***ordinary person*** to identify" that Turner requested the covered video material from the NNA.

## C. Turner's Intended Application of the VPPA is Unconstitutional

### 1. The VPPA is Unconstitutionally Vague under the Fifth Amendment

In Turner's view, the VPPA is broad enough to allow her to recover statutory damages for disclosing and publicizing the exact same information, without any remote claim of injury caused by the alleged disclosure. Turner argues that the NNA does not demonstrate "that the VPPA either 'does not define the conduct it prohibits so that an ordinary person would not know what is required of him' or 'encourages arbitrary and discriminatory enforcement.'" *See Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1440 (9th Cir. 1996). This case demonstrates both elements.

As explained throughout this motion, the VPPA (a) does not adequately define VTSP (and incorporates the antiquated technology of "videocassette tapes"), (b) includes no express exception for information that is already public), and (c) does

not adequately define "disclosure" in light of changing internet technologies. The vagueness in these key provisions of the VPPA prevents companies from determining who is subject to the VPPA, how to develop their sites to comply with the VPPA, and encourages broad ranging legal theories in private lawsuits. This Court should find that the VPPA is unconstitutionally void.

### 2.    The VPPA as Applied Violates the First Amendment

"Two types of First Amendment challenges may be brought against a law: facial, and as-applied." *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999). In an "as applied" challenge, the movant "must show only that the statute unconstitutionally regulates *[the movant's] own speech*." *Porter v. Gore*, 517 F. Supp. 3d 1109, 1124 (S.D. Cal. 2021)(citing *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1174–75 (9th Cir. 2018) (add'l citation omitted). *See also N.M. Youth Organized v. Herrera*, 611 F.3d 669, 677 n.5 (10th Cir. 2010) ("[An] 'as-applied' challenge to a law acknowledges that the law may have some potential constitutionally permissible applications, but argues that the law is not constitutional as applied to [particular parties]."). Any restriction on commercial speech must meet three conditions: (1) the government must have a "substantial interest in regulating the speech," (2) the regulation must "directly and materially advance[] that interest," and (3) the regulation must be "no more extensive than necessary to serve the interest." *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980).

In this as applied challenge, Turner cannot meet any of these elements. First, Turner has not shown a "substantial [government] interest" in preventing the NNA from sharing the same information she publicly disclosed and promoted (that she obtained an NSA certification from an NNA course).

Even if the government has a general privacy interest in regulating private video information, penalizing the NNA for disclosing Turner's public information

would not "directly and materially advance that interest," and would be "more extensive than necessary to serve the interest." *Id*. As explained in the NNA's motion, numerous courts have held that publication of information on the internet obviated any privacy interest in the published information. *See* Mot. at 10, 12 (collecting cases). In the Fourth Amendment context (where privacy interests are more stringent), the Supreme Court has held that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Carpenter v. United States*, 585 U.S. 296, 308 (2018)(quoting *Smith v. Maryland,* 442 U.S. 735, 743–44 (1979)). *See* Mot. at 10. If there is no expectation of privacy in the Fourth Amendment context, then there is also no government interest in regulating the NNA for allegedly sharing public facts.

The two cases relied on by Turner are easily distinguishable. In *Stark II*, the Court elected to defer review of the challenge until after discovery. *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1034-35 (N.D. Cal. 2023)(defendant "abandoned its as-applied challenge"). *Saunders* was an as-applied challenge relating to the use of certain technology on its website, but did not involve an attempted regulation of the defendant sharing public facts, like here. *See Saunders v. Hearst Television, Inc.,* 711 F. Supp. 3d 24, 33 (D. Mass. 2024).

Turner's application of the VPPA against the NNA violates the First Amendment.

## III.    CONCLUSION

For all the reasons set forth above, and in the NNA's Motion to Dismiss, this Court should dismiss Plaintiff's Complaint with prejudice.

Dated:  April 17, 2025                    CLARK HILL

                                         By: *s/Myriah V. Jaworski*
                                              Myriah V. Jaworski

                                         *Attorney for Defendant National Notary Association*

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant National Notary Association, certifies that this brief contains 6,256 words, which complies with the word limit of L.R. 11-6.1.

                         By:    *s/Myriah V. Jaworski*
                                Myriah V. Jaworski

DEFENDANT NATIONAL NOTARY ASSOCIATIONS REPLY IN SUPPORT OF ITS MOTION TO DISMISS